**Terry L. HAITH, Plaintiff,**

**v.**

**James G. MARTIN, et al., Defendants.**

**No. 84–1319–CIV–5.**

United States District Court, E.D. North Carolina, Raleigh Division.

Aug. 8, 1986.

Allen Foster, Foster, Conner & Robson, PA, Greensboro, N.C., for plaintiff.

James Wallace, Jr., Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., for defendants.

## MEMORANDUM OF DECISION

DUPREE, District Judge.

Alleging that defendants have taken steps toward holding elections in November, 1986 to fill superior court judgeships in Judicial Districts 3, 4, 8 and 12 and that

defendants knew or should have known that elections in those districts were forbidden by this court's order of September 27, 1985 plaintiff filed a motion on June 9, 1986 seeking to enjoin the holding of elections to fill *any judgeships* in those districts pending preclearance for such elections by the Department of Justice or a decision by the District Court for the District of Columbia allowing the elections to proceed.[1] The defendants have filed a response in opposition, a hearing before the three-judge court has been held and the motion is ripe for decision.[2]

The judgeships for which defendants propose to hold elections in 1986 were created by statutes enacted prior to the Voting Rights Act of 1965 and, nothing else appearing, those judgeships would not be affected by the Act. However, since the effective date of that Act the General Assembly of North Carolina in Chapter 997, Session Laws of 1967, and Chapter 1119, Session Laws of 1977, created additional superior court judgeships in Judicial Districts 3, 4, 8 and 12. In its order of September 27, 1985 this court enjoined the holding of elections pursuant to those statutes pending approval by the Attorney General of the United States or the District Court for the District of Columbia as required by Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Thereafter the Attorney General of the United States interposed an objection to those statutes under Section 5, and an action brought by defendants in the District Court for the District of

Columbia to reverse his decision remains undecided.

Defendants recognize that elections may not be held to fill the additional judgeships created by the two statutes pending resolution of the subject litigation, but they propose to hold elections to fill the judgeships created by statutes which predated the Voting Rights Act. Plaintiff, on the other hand, contends that elections to fill judgeships created prior to Section 5 may not be held, and that to do so would violate this court's order. The nub of plaintiff's argument seems to be that when new judgeships are created the elections for which are not to be held concurrently with elections for existing judgeships the effect is to create numbered seats with staggered terms for all of the judgeships and that the purpose or effect of such statutes is to deny or abridge the right of minorities to vote.[3] A reading of relevant Supreme Court authority in the light of the facts of this case has led us to conclude to the contrary.

*Lockhart v. United States,* 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983), would seem at first blush to support the plaintiff's position. In that case the City of Lockhart, Texas had for years been governed by a three-member commission consisting of a mayor and two commissioners, all serving the same two-year terms. These offices were filled in even numbered years through at-large elections using a "numbered post" system whereby the two commission posts were designated by number and each candidate specified the post

1. The motion also sought to enjoin judicial elections in Districts 18 and 20, but since defendants do not propose to hold elections in District 18 at this time and the first scheduled election in District 20 is more than four years away at which time it is hoped this litigation will have long since been laid to rest, this opinion will concern itself only with Districts 3, 4, 8 and 12.

2. The motion was combined with a petition for a rule to show cause why the defendants should not be held in contempt for violating this court's order of September 27, 1985, but in view of the disposition we make of the motion for injunctive relief the petition for a contempt citation is denied as moot. We deem it not amiss to add, however, that the record does not disclose the

slightest evidence to support the charge that the defendants in relying on what we now find to have been the sound advice of the Attorney General of North Carolina, have not acted in entire good faith in the matter.

3. The Supreme Court has recognized that statutes which create numbered post seats and staggered terms may have a discriminatory effect in some circumstances in districts where racial voting predominates for that such voting procedures may frustrate the use of "single-shot voting," a technique that permits concentrating support behind a single candidate. *Lockhart v. United States,* 460 U.S. 125, 134–135, 103 S.Ct. 998, 1004–05, 74 L.Ed.2d 863 (1983).

for which he or she sought election. In 1973 the city adopted a new charter under which a city council consisting of the mayor and four councilmen were to serve staggered two-year terms. The mayor and two councilmen were to be elected in even numbered years through at-large elections using the numbered post system, and the other two councilmen were to be similarly elected in odd numbered years. Forty-seven percent of the city's population were Mexican-American, but as of 1977 less than thirty percent of the registered voters were Mexican-American. In a suit by Mexican-Americans in federal district court in Texas further elections were enjoined under the new plan pending preclearance under Section 5 of the Votings Rights Act. The Attorney General precleared the changes effected by the new plan except to the extent that they incorporated at-large elections, the numbered post system and staggered terms for councilmen.

The city then filed suit under Section 5 in the District Court for the District of Columbia seeking a declaratory judgment that the remaining changes did not have the purpose or effect of denying voting rights guaranteed by Section 5. On appeal to the Supreme Court it was held that the entire election plan of 1973 was subject to preclearance under Section 5; that the discriminatory effect of the new seats could not be determined in isolation from the "pre-existing" elements of the council; and that the impact of any of the seats could not be evaluated without considering the fact that they were all to be filled in elections using numbered posts.

> In moving from a three-member commission to a five-member council, Lockhart has changed the nature of the seats at issue. Council posts one and two are not identical to the old commission posts one and two. For example, they now constitute only 40% of the council, rather than 67% of the commission. Moreover, one cannot view these seats in isolation, for they are an integral part of the council.

The possible discriminatory purpose or effect of the new seats, admittedly subject to § 5, cannot be determined in isolation from the "pre-existing" elements of the council. Similarly, the numbered-post system is an integral part of the new election plan. The impact of any of the seats cannot be evaluated without considering the fact that they are all filled in elections using numbered posts. We therefore hold that the entire system introduced in the 1973 charter is subject to pre-clearance.

*Id.* at 131, 103 S.Ct. at 1002.

The Court went on to hold, however, that the introduction of staggered terms and the continued use of numbered posts would not diminish the voting strength of the city's minorities.

> Under the old system, the voters faced two at-large elections with numbered posts every two years. Now they face two at-large elections with numbered posts every year. The inability to use single-shot voting is identical. The degree of highlighting of individual races is identical. Minorities are in the same position every year that they used to be in every other year. Although there may have been no improvement in their voting strength, there has been no retrogression either.

*Id.* at 135, 103 S.Ct. at 1004.

More nearly in point here is the case of *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976).[4] In that case the city charter of New Orleans had provided since 1954 for a seven-member city council, with one member being elected from each of five districts, and two being elected by the voters of the city at large. In 1961 the city was redistricted on the basis of the 1960 census so that in one district blacks constituted a majority of the population but only about half of the registered voters and in the other four districts white voters outnumbered blacks.

---

**4.** Defendants in their brief have cited *Beer* in general support of their position, but have not undertaken to relate the facts in that case to those in the case at bar. The plaintiff did not cite any cases in his brief, and we have found none that directly support his position.

After the 1970 census a reapportionment plan was devised under which there would be black population majorities in two districts and a black voter majority in one. Following objection by the Attorney General New Orleans sought by declaratory judgment in the District Court for the District of Columbia to have its plan validated. That court rejected the city's claims, holding that the entire plan including the provision for continuing two at-large seats would have the effect of abridging the voting rights of blacks.

In reversing the district court the Supreme Court held that the city's plan could not be rejected solely because it did not eliminate the two at-large seats that had existed since 1954. The Court said that "the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise," *id.* at 141, 96 S.Ct. at 1364, and thus it was held that where a legislative reapportionment enhances the position of racial minorities with respect to the effective exercise of their electoral franchise it cannot have the effect of abridging the right to vote within the meaning of Section 5. Since under the city's new plan the chances of blacks electing candidates of their choice were considerably enhanced over their chances under the previous plan, it was held error for the district court to conclude that the plan would have the effect of denying or abridging the right to vote on account of race or color.

▉ Construing *Lockhart* and *Beer* together, two principles clearly emerge: (1) voting procedure changes which do not lead to a retrogression in the position of racial minorities with respect to the effective exercise of their voting rights do not offend Section 5 of the Voting Rights Act, and (2) voting procedures in effect at the time of the enactment of the Voting Rights Act which do not become an integral part of new voting procedures which are subject to Section 5 are not affected thereby.

▉ Application of these principles to the facts of the present case have led us to conclude that the elections proposed to be held in Judicial Districts 3, 4, 8 and 12 will not result in any retrogression in the voting right privileges of racial minorities in those districts and that the judgeships to be filled in those districts in 1986, all of which were created under pre-Section 5 law, have not become an integral part of the voting procedures established by the North Carolina statutes creating new judgeships in those districts. As in *Beer,* the voting rights of minorities with respect to the old judgeships are the same as they were prior to the creation of the new judgeships, and the judges elected to fill the old judgeships will have the identical jurisdictional powers and duties as they had before the creation of the new judgeships. The proposal of the defendants to hold elections to fill the old judgeships in Districts 3, 4, 8 and 12 in 1986 in no way offends the provisions of this court's order of September 27, 1985.

Accordingly, plaintiff's motion to enjoin the holding of elections to fill those judgeships as well as his petition for a rule to show cause why the defendants should not be held in contempt for violating the September 27, 1985 order must be denied. An appropriate order to this effect is being entered.